John J. Nelson (SBN 317598)
jnelson@milberg.com
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
402 W. Broadway, Suite 1760
San Diego, CA 92101
Telephone: (858) 209-6941
Fax: (865) 522-0049

*Attorney for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JONATHAN TRIMBOLI**, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**FILMSUPPLY, LLC**, a Texas Limited Liability Company,<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR**:<br><br>**(1) Violation of the Video Privacy Protection Act (18 U.S.C. § 2710);**<br><br>**(2) Violation of Cal. Civ. Code § 1799.3;**<br><br>**(3) Violation of Business & Professional Code §§ 17200 et seq. (UCL).**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

CLASS ACTION COMPLAINT

Plaintiff, Jonathan Trimboli ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge, or, where applicable, information, belief, and the investigation of counsel:

## NATURE OF THE ACTION

1.      This is a privacy class action lawsuit against Defendant Filmsupply, LLC ("Defendant" or "Filmsupply") seeking statutory damages, civil penalties, restitution, disgorgement of profits, declaratory relief, injunctive relief, and reasonable attorney's fees and costs pursuant to the Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA"), Cal. Civ. Code § 1799.3, and Cal. Business & Professions Code §§ 17200 ("UCL").

2.      Filmsupply is a stock video seller. Its customers purchase stock video footage to license and download from its online library, which offers thousands of prerecorded videos.[1] Customers purchase and license individual stock video clips which range in price from $109 to $219 per clip.[2]

3.      Unbeknownst to Plaintiff and Class Members, as defined below, and without their consent, Filmsupply disclosed and, upon information and belief, continues to disclose their users' personally identifiable information, including a record of every prerecorded video they watch and/or download ("Personally Identifiable Information" or "PII"), to third parties.  Filmsupply does this through the use of the Meta Pixel, which is a piece of software that Filmsupply installed on its website to track, record, and disclose its subscribers' PII to Meta.

4.      Filmsupply uses this information to learn its subscribers' habits and preferences in order to push advertisements to them. Meta uses the information it receives from FilmSupply to deliver targeted advertisements and enhance its marketing efforts, and

5.      Defendant's disclosure of Plaintiff and Class Members' PII, without their informed consent, violates the VPPA and the Cal. Civ. Code § 1799.3 and constitutes unlawful, unfair, and/or fraudulent business practices.

---

[1] *See* https://www.filmsupply.com/clips?page=1 (Last visited July 1, 2024).
[2] *See* https://www.filmsupply.com/pricing

**PARTIES**

6.      Plaintiff Jonathan Trimboli is a citizen of California, residing in Sonoma County. In or about June 2022 Plaintiff began watching and downloading stock videos on filmsupply.com. Throughout the time that Plaintiff has used Defendant's services and viewed/licensed/downloaded videos from Defendant's website.

7.      Defendant, Filmsupply, LLC, is a Texas limited liability company with its principal place of business in Fort Worth, Texas. Defendant developed, maintains, owns and/or operates the Website.

**JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (*i.e.*, the VPPA).   This Court also has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the Class, and there is minimal diversity.

9.      This Court has personal jurisdiction over Defendant because it conducts substantial business within California, including the sale, marketing, and advertising of video content via its website.  Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this state.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.   In particular, Defendant disclosed Plaintiff's video viewing information to at least one Unauthorized Third Party that resides in this District (Meta Platforms, Inc.).

**FACTUAL BACKGROUND**

**A.      The VPPA**

11.      The Video Privacy Protection Act of 1988 was enacted in response to unauthorized publication of Supreme Court nominee Robert Bork's video rental history.  The incident sparked

concerns over privacy protections in a digital age and, in particular, the gaps in the digital privacy law.  As senator Patrick Leahy, who introduced the act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think this is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

12.     The VPPA recognized that our video-viewing habits are intimately private. The law accordingly requires companies that sell, rent, or offer subscriptions to prerecorded videos to maintain their customers' privacy and forbids, among other things, the knowing disclosure of customers' video choices to any third party without the customers' specific advance written consent.

13.     To that end, the VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

**B.     Cal. Civ. Proc. Code § 1799.3**

14.     A California statute analogous to the VPPA was passed the same year as the VPPA.

15.     Cal. Civ. Code § 1799.3 prohibits video sellers or renters from disclosing "any personal information or the contents of any record, including sales or rental information, which is

prepared or maintained by that person, to any person, other than the individual who is subject of the record, without the written consent of that individual."[3]

**C.** **Filmsupply Has Provided Videotape Service Throughout the Relevant Period**

16. Filmsupply operates a stock video sales service by which its user can watch, license, and download prerecorded videos.[4]

17. Plaintiff and other Class Members purchase prerecorded stock videos on www.Filmsupply.com. Individual video prices range, depending on the customers' use, from $109 to $219 per video. *See* Figure #1 below:[5]

**Figure # 1**



//

//

---

[3] *See* Cal. Civ. Code § 1799.3(a).
[4] *See* https://www.filmsupply.com/collections (Last visited July 1, 2024).
[5] *See* https://www.filmsupply.com/pricing

18.     After accessing www.Filmsupply.com, customers can view, download and purchase over 2,500 high quality prerecorded videos.[6]

19.     Thus, Defendant is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4) because it is engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."

20.     And Plaintiff and other Class Members are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1) because they are "subscriber[s] of goods or services from a video tape service provider."

21.     Defendant is also a "person providing video recording sales or rental services" within the meaning of Cal. Civ. Code § 1799.3(a), because it is engaged in the business of "providing video recording sales or rental services."

22.     And Plaintiff and Class Members are "person[s] who is the subject of the records" under Cal. Civ. Code § 1799.3(c).

**D.     Filmsupply and the Meta Tracking Pixel**

23.     Meta Platform Inc. (formerly called Facebook) is the world's largest social media company. Meta reported having 2.04 billion daily active users as of March 2023,[7] and reported $116.61 billion in revenue in fiscal year 2022.[8]

24.     Meta's current revenue, as well as its revenue when the company was called Facebook, Inc., has been derived almost entirely from selling targeted advertising to Facebook users, users of its family of apps including Instagram, and internet users on non-Facebook sites that integrate Meta marketing source code on their websites. Meta reported in Fiscal Year 2022 that its revenue from advertising was over $113 billion and Meta stated that it "generated substantially all

---

[6] See https://www.Filmsupplys.com/clips?page=1 (Last visited July 1, 2024).
[7] Meta Reports First Quarter 2023 Results, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-First-Quarter-2023-Results-2023.pdf
[8] Meta Reports Fourth Quarter and Full Year 2022 Results, 2/1/23, https://s21.q4cdn.com/399680738/files/doc_financials/2022/q4/Meta-12.31.2022-Exhibit-99.1-FINAL.pdf (last visited 6/6/2023).

of our revenue from selling advertising placements on our family of apps to marketers."[9] In its 10k filing covering the fiscal year 2018, Facebook similarly admitted that, "We generate substantially all of our revenue from selling advertising placements to marketers."[10]

25.     Facebook describes itself as a "real identity platform,"[11] meaning users are allowed only one account and must share "the name they go by in everyday life."[12]   Therefore, when users create an account, they must provide their first and last name, along with their birthday and gender.[13]

26.     Facebook sells advertising space by highlighting its ability to target users.[14] Facebook can target users so effectively because it surveils user activity both on and off its site.[15] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "Connections".[16] Facebook complies this information into a generalized dataset called "Core Audiences", which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[17]

27.     Advertisers can also build "Custom Audiences."[18]   Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're

---

[9] Meta, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2022, https://www.sec.gov/Archives/edgar/data/1326801/000132680123000013/meta-20221231.htm (last visited June 19, 2022).
[10] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018. https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm.
[11] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[12] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[13] FACEBOOK, SIGN-UP, http://www.facebook.com/
[14] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[15] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[16] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.
[17] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,https://www.facebook.com/business/news/Core-Audiences.
[18] FACEBOOK, ABOUT CUSTOM AUDIENCES,https://www.facebook.com/business/help/744354708981227?id=2469097953376494

loyal customers or people who have visited [their] website."[19] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[20] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[21] One such Business Tool is the Meta Tracking Pixel.

28.     The Meta Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[22] When the Meta Pixel captures an action, it sends a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

29.     Advertisers control what actions—or, as Facebook calls it, "events"—the Meta Tracking Pixel will collect along with what pages a visitor views and what buttons a visitor clicks.[23] Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or

---

[19] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE,https://www.facebook.com/business/help/366151833804507?id=300360584271273.
[20] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[21] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494.
[22] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.
[23] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

purchases.[24]  An advertiser can also create their own tracking parameters by building a "custom event."[25]

30.    Advertisers control how the Meta Tracking Pixel identifies visitors. The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[26] Http Headers collect "IP Addresses, information about web browser, page location, document, [referrer] and persons using the website."[27] Pixel-specific Data includes "the Pixel ID and cookie."[28]

31.    FTC Commissioner Rohit Chopra addressed the harms that can be caused by sharing information with Facebook when he stated in 2019, "Because behavioral advertising allows advertisers to use mass surveillance as a means to their undisclosed and potentially nefarious ends, Facebook users are exposed to propaganda, manipulation, discrimination, and other harms.  . . . Facebook's massive, private, and generally unsupervised network of advertisers has virtually free rein to microtarget its ads based on every aspect of a user's profile and activity. The company's detailed dossiers of private information includes things like a user's location and personal connections, but it also includes the history of everything a user has ever done wherever Facebook is embedded in the digital world."[29]

32.    On information and belief, in or about February 2018 and continuing to the present, Defendant implemented the Meta Pixel on its website — www.Filmsupply.com.

---

[24] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[25] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.
[26] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.
[27] See id.
[28] See id.
[29] See Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No, 1823109, July 24, 2019.
https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statem ent on facebook_7-24-19.pdf.

**E.** **Filmsupply Knowingly and Intentionally Disclosed and/or Released Plaintiff's and Class Members' Personally Identifiable Information to Meta.**

33.     Beginning in or about February 2018 and continuing to the present, through the use of the Meta Pixel, Defendant has released or disclosed Plaintiff's and other Class Members' "personal information or the contents of any record, including [their] sales or rental information, including "information which identifies a person as having requested or obtained specific video materials or services" to Meta.

34.     Specifically, when Plaintiff or another Class Member visited www.Filmsupply.com, the Meta Pixel automatically caused the Plaintiff's or the Class Members' personal identifiers, including IP addresses and the c_user, _fr, _and datr cookies, to be transmitted to Meta, attached to the fact that the Plaintiff or the Class Member had visited the website and the titles of the webpages the Plaintiff or the Class Member visited.

35.     The cookies that were transmitted as a result of the Meta Pixels that Defendant installed on its website conveyed Plaintiff's and Class Members' Facebook IDs (through the c_user cookie), which can be used by Facebook and any ordinary person to find the user's real name, the specific and unique web browser from which the customer is sending the communication, and an encrypted combination of the information contained in those two cookies (fr cookie).

36.     Filmsupply's hosted Meta Tracking Pixel transmits information associated with two distinct events to Meta, the first of which – "PageView" – is shown in Figure #2 below:[30]

---

[30] This data derives from a tool created and offered by Facebook.

1

**<u>Figure #2</u>**





37.     The information associated with this event—PageView—and transmitted to Meta, permits an ordinary person to identify a specific individual's video viewing behavior.

38.     When a subscriber visits a page that hosts a prerecorded video, the PageView event transmits the Uniform Resource Locator ("URL") accessed, which contains the title of the video. *See* Figure #3 below:

**Figure #3**

 **Meta Pixel Helper**
Learn More


---

One pixel found on www.filmsupply.com

---

 Meta Pixel                    Troubleshoot Pixel
Pixel ID: 349994298704840 click to copy    Set up events

▼ ✅ PageView

**ADVANCED MATCHING PARAMETERS SENT**

**external_id:** Hide

  0f3e70c2dd68dfec94e51ae918217bc1

**EVENT INFO**

**Setup Method:** Manual
**URL called:** Hide

  https://www.facebook.com/tr/?id=349994298704840&ev=PageVie
  w&dl=https%3A%2F%2Fwww.filmsupply.com%2Fclips%2Ftornado-an
  d-lightning-sweeping-across-the-field%2F21405&rl=https%3A%
  2F%2Fwww.google.com%2F&if=false&ts=1717442039834&sw=1920&s
  h=1080&ud[external_id]=0f3e70c2dd68dfec94e51ae918217bc1&ud
  ff[fn]=96d9632f363564cc3032521409cf22a852f2032eec099ed5967
  c0d000cec607a&udff[ln]=6627835f988e2c5e50533d491163072d3f4
  f41f5c8b04630150debb3722ca2dd&udff[em]=4c3dfb8d4307da829a8
  050c51129f0615e888b475543f3c255d1cad64f541cb0&v=2.9.157&r=
  stable&a=hubspot&ec=6&o=6174&fbp=fb.1.1713279542989.176662
  1776&eid=ob3_plugin-set_852da2c763b55412b4bf2705733b08737f
  65e93271d7c7e72bf87a463ae73919&cs_est=true&ler=other&cdl=A
  PI_unavailable&it=1717441935495&coo=false&rqm=GET

**Load Time:** 131.36 ms
**Pixel Location:** Hide

  https://www.filmsupply.com/clips/tornado-and-lightning-swe
  eping-across-the-field/21405

**Event ID:** ob3_plugin-
set_852da2c763b55412b4bf2705733b08737f65e93271d7c7e72bf87a

39.     The PageView event sends the title of the prerecorded video in plain text, identifiable by an ordinary person, to Meta.

40.     When a subscriber downloads a prerecorded video, the Download event transmits the Uniform Resource Locator ("URL") accessed, which contains the title of the video. See Figure #4 Below:

///

///

**Figure #4**

```
id: 349994298704840
ev: SubscribedButtonClick
dl: https://www.filmsupply.com/clips/father-spins-around-with-his-infant-son-in-a-park-in-the-morning/
rl:
if: false
ts: 1718116988062
cd[buttonFeatures]: {"classList":"previewButton css-1rvbvbz e1829w741","destination":"","id":"","image
hildButtons":0,"tag":"button","type":null,"name":"","value":""}
cd[buttonText]: Preview
cd[formFeatures]: []
cd[pageFeatures]: {"title":"Father spins around with his infant son in a park | Stock video footage 54
cd[parameters]: []
```

41.     The Download event sends to Meta the title of the prerecorded video in plain text, identifiable by an ordinary person.

42.     A visitor who has not logged out of Facebook while watching and/or downloading a video on Filmsupply will transmit the c_user cookie to Facebook. The c_user cookie contains that visitor's unencrypted Facebook ID. When accessing the above video, for example, the Meta Pixel on Filmsupply's website compels the visitor's browser to send multiple cookies, in addition to the c_user cookie. *See* Figure #5 below:

**Figure #5**

| Name | Value | Domain | Path | Expire... | Size | HttpO... | Secure | Same... | Partiti... | Priority |
|------|-------|--------|------|-----------|------|----------|--------|---------|-----------|----------|
| c_user | 10000 ███ ← | .faceb... | / | 2025-... | 21 | | ✓ | None | | Medium |
| datr | saFWZXu696kRJfnBDt3cUDkn | .faceb... | / | 2024-... | 28 | ✓ | ✓ | None | | Medium |
| fr | 12ku163EnBwCtjWps.AWX0k1uyp6JGlDbA... | .faceb... | / | 2024-... | 82 | ✓ | ✓ | None | | Medium |
| presence | EDvF3EtimeF1717420984EuserFA21B0311... | .faceb... | / | 2024-... | 61 | | ✓ | None | | Medium |
| ps_n | 1 | .faceb... | / | 2025-... | 5 | ✓ | ✓ | None | | Medium |
| sb | saFWZTYcT89vhNpJu_mc48fL | .faceb... | / | 2025-... | 26 | ✓ | ✓ | None | | Medium |
| usida | eyJ2ZXIiOjEsImlkIjoiQXNlaWFWFpZTNtb2F3Y... | .faceb... | / | Session | 69 | | ✓ | None | | Medium |
| xs | 9%3AdXxBtLEXwuwdrA%3A2%3A31716322... | .faceb... | / | 2025-... | 98 | ✓ | ✓ | None | | Medium |

43.     A Facebook ID, along with the title of the prerecorded video watched and downloaded, is PII.  Anyone can identify a Facebook profile and all personal information publicly listed on that profile, including a person's first and last name—by appending the Facebook ID to the end of Facebook.com. For example, Meta CEO Mark Zuckerberg's Facebook ID is four and the URL "www.facebook.com/4" will take you to Mark Zuckerberg's Facebook page.

44.     By compelling a visitor's browser to disclose the c_user cookie alongside event data for videos, Filmsupply knowingly and intentionally discloses information sufficient for an ordinary person to identify a specific individual's video viewing and downloading behavior.

45.     When a visitor's browser has recently logged out of Facebook, Filmsupply compels the browser to send a smaller set of cookies. *See* Figure #6 below:

**Figure #6**

| Name ▲ | Value |
|--------|-------|
| c_user | 100003111327352 |
| datr | saFWZXu696kRJfnBDt3cUDkn |
| fr | 12ku163EnBwCtjWps.AWX0k1uyp6JGlDbA... |
| presence | EDvF3EtimeF1717420984EuserFA21B0311... |
| ps_n | 1 |
| sb | saFWZTYcT89vhNpJu_mc48fL |
| usida | eyJ2ZXIiOjEsImlkIjoiQXNlaWFWFpZTNtb2F3Y... |
| xs | 9%3AdXxBtLEXwuwdrA%3A2%3A31716322... |

46.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[31] The datr cookies also identifies a browser.[32]  Facebook, at a minimum, uses the fr cookies to identify users.[33]

47.     Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser. Facebook uses the cookie for targeted advertising.

48.     Facebook, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profile.

**F.     Experience of Plaintiff**

49.     In or about June 2022, Plaintiff created a Facebook account that is associated with his real (legal) name and email address.

50.     In or about June 2022, Plaintiff first accessed www.Filmsupply.com, in order to watch and download prerecorded videos.

51.     While using www.Filmsupply.com, Plaintiff regularly watched and downloaded prerecorded videos on the same device that he uses to access his Facebook account.

52.     When Plaintiff watches and downloads videos on Filmsupply.com, the title of the videos is sent to Meta alongside his Facebook ID, browser identifiers, device identifiers, and other identifying information that links him to the specific videos that he requested and viewed.

53.     By disclosing his event data and identifiers, Defendant disclosed Plaintiff's PII to Meta.

54.     Plaintiff did not consent to the disclosure of his PII, in writing or otherwise, and Defendant did not attempt to obtain his consent in a form separate and distinct from other legal and financial obligations.

---

[31] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[32] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[33] *Id.*

55.     Plaintiff discovered that Filmsupply surreptitiously collected and transmitted his personally identifiable information in or about June 3, 2024.

56.     Because the specific tracking tools are invisible to ordinary website visitors such as Plaintiff, he had no way of knowing that his video viewing history would be transmitted to Meta via the Meta Pixel, Conversions API, and related tools embedded in the source code of the website.

**TOLLING OF THE STATUES OF LIMITATIONS**

57.     Each unauthorized transmission of Plaintiff's and Class Members' Personally Identifiable Information by Defendant is a separate unlawful act that triggers anew the relevant state of limitations.

58.     Additionally, any applicable statutes of limitation have been tolled by: (1) the fraudulent concealment doctrine based on Defendant's knowing and active concealment and denial of the facts alleged herein including but not limited to its incorporation of the tracking pixels and devices; and (2) the delayed discovery doctrine, as Plaintiff and Class Members did not and could not reasonably have discovered Defendant's conduct alleged herein until shortly before the filing of this Complaint. Plaintiff and Class Members did not discover and could not reasonably have discovered that Defendant was disclosing and releasing their Personally Identifiable Information in the ways set forth in this Complaint until shortly before this lawsuit was filed in consultation with counsel.

59.     The Meta Pixel, and other tracking tools on Filmsupply's website, were and remain entirely invisible to a website visitor.

60.     Through no fault of their own or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's unlawful conduct. Defendant's Privacy Policy does not inform Defendant's customers that their Personally Identifiable Information will be disclosed to unauthorized third parties such as Meta as described in this Complaint.

61.     Plaintiff was therefore ignorant of the information essential to pursue his claims, without any fault or lack of diligence on their part.

62.     Defendant has exclusive knowledge that Filmsupply's website incorporates the Meta Pixel, and other tracking tools, and the information those pixels and tools are configured to collect and disclose, and yet Defendant failed and continues to fail to disclose to website visitors,

including Plaintiff and Class Members, that by interacting with Filmsupply's website their PII would be disclosed to, released to, or intercepted by Meta and other unauthorized third parties.

63.     Under the VPPA and California law, Defendant was and continues to be under a duty to disclose the nature, significance, and consequences of its collection and treatment of its website visitors' and customers' PII. However, to date, Defendant has not conceded, acknowledged, or otherwise indicated to Filmsupplys' customers and other website visitors that Filmsupply discloses or releases their PII to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

64.     Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

## CLASS ALLEGATIONS

65.     Plaintiff brings this action on behalf of himself and all others similarly situated, and seeks to represent the following Class (members of which are collectively referred to herein as "Class Members"):

> All natural persons who subscribed to Filmsupply, and while having a Facebook account, viewed or downloaded prerecorded video content on www.Filmsupply.com during the time the Meta Pixel was active on www.Filmsupply.com.

66.     Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of an amended class definition, or the use of one or more subclasses.

67.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiff does not know the exact number of members of the aforementioned Classes.  However, given the popularity of

Defendant's website, the number of persons within both Classes are believed to be so numerous that joinder of all members is impractical.

68.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

(a) Whether Defendant had Meta Pixels embedded on its website that disclosed Class Members' PII to Meta and/or any other unauthorized third party;

(b) Whether Defendant is engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials" and, thus, is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4);

(c) Whether Class Members are "subscriber[s] of goods or services from a video tape service provider" and, thus, are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1);

(d) Whether Defendant had Meta Pixels embedded on its website that disclosed Class Members' PII to Meta and/or any other unauthorized third party;

(e) Whether Class Members' information collected, disclosed, and shared by Defendant with unauthorized third parties, including Meta, constitutes PII within the meaning of the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*;

(f) Whether Defendant obtained "informed, written consent" from Class Members within the meaning of 18 U.S.C. § 2710(b)(2)(b);

(g) Whether Filmsupply's acts and practices violated the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*;

(h) Whether the Class is entitled to liquidated penalties under 18 U.S.C. § 2710(c)(2)(A), as a result of Filmsupply's conduct;

(i) Whether the information Filmsupply disclosed to Meta concerning Class Members' video views and downloads constitutes "personal information or the contents of any

record, including sales or rental information, which is prepared or maintain" by Filmsupply within the meaning of Cal. Civ. Code § 1799.3(a);

(j) Whether Defendant knowingly and intentionally disclosed Plaintiff's and Class Members' "personal information or the contents of any record, including sales or rental information" to Meta within the meaning of Cal. Civ. Code § 1799.3(a);

(k) Whether Class Members provided written consent to Filmsupply's disclosure of their personal information or record contents to Meta within the meaning of Cal. Civ. Code § 1799.3(a);

(l) Whether Filmsupply's acts and practices violated Cal. Civ. Code § 1799.3;

(m) Whether the Class is entitled to civil penalties under Cal. Civ. Code § 1799.3(c), as a result of Filmsupply's conduct;

(n) Whether Defendant's acts and practices violated Business and Professions Code §§ 17200, et seq;

(o) Whether Defendant's acts and practices harmed Plaintiff and Class Members;

(p) Whether Plaintiff and the Class Members are entitled to an injunction and equitable relief, including but not limited to, restitution and disgorgement; and

(q) Whether Plaintiff and the Class Members are entitled to damages and other monetary relief, and if so, what is the appropriate amount of damages or other monetary relief; and

(r) Whether Plaintiff and Class Members are entitled to reasonable attorneys' fees and costs.

69.     **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Classes, used filmsupply.com to watch videos, and had his PII collected and disclosed by Defendant without his knowledge or consent. Moreover, , like all members of the Class, he had his personal information shared with Unauthorized Third Parties in violation of Cal. Civ. Code § 1799.3.

70.     **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action

litigation, including litigation concerning the VPPA and Cal. Civ. Code § 1799.3.  Plaintiff and his counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Classes.  Neither Plaintiff nor his counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Classes.  Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Class and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes (or to address additional Classes), additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendant took.

71.    **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable.  Even if every member of the Classes could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes.  Plaintiff anticipates no difficulty in the management of this action as a class action.

72.    Plaintiff reserves the right to add representatives for the Class, provided Defendant is afforded an opportunity to conduct discovery as to those representatives.

**FIRST CAUSE OF ACTION**

**<u>Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq.</u>**

73.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

74.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent . . . of the consumer" and the opportunity to opt out of disclosures. *See generally* 18 U.S.C. § 2710.

75.     Filmsupply is a "video tape service provider" because it is "engaged in the business, in or affecting interstate commerce, of . . . delivery of prerecorded . . . audiovisual materials." 18 U.S.C. § 2710(a)(4).

76.     Plaintiff and Class Members are "consumers" because they are subscribers to Filmsupply's services, each having viewed and downloaded a video(s) from Filmsupply's library of pre-recorded videos. 18 U.S.C. § 2710(a)(1).

77.     Filmsupply discloses "personally identifiable information" of Plaintiff and other Class Members to Meta, and, on information and belief, other unauthorized third parties, because Filmsupply sends "information which identifies a person as having requested or obtained specific video materials" from Filmsupply, 18 U.S.C. § 2710(a)(3), specifically the title and/or identity of every video purchased alongside information that would permit an ordinary person to identify the user.

78.     Filmsupply does not seek, let alone receive, "informed, written consent" from Plaintiff and other Class Members, 18 U.S.C. § 2710(b)(2)(B), and it consequently never provides them the opportunity to withdraw any such consent, 18 U.S.C. § 2710(b)(2)(iii).

79.     Filmsupply provides Plaintiff's and Class Members PII to Meta, and, on information and belief, other unauthorized third parties, knowingly. In particular, Filmsupply installed, embedded, and/or otherwise permitted the presence of the Meta Pixel, on its website and knew that this pixel and tracking tool would gather and disclose the titles and/or identities of prerecorded videos viewed, licensed and downloaded by Plaintiff and Class Members.

80.     By knowingly disclosing Plaintiff's and other Class Members' personal viewing habits, Filmsupply violates Plaintiff's and other Class Members' statutorily protected right to privacy in their video-viewing habits and activities. See 18 U.S.C. § 2710(c).

81.     As a result of the above-described violations, Filmsupply is liable to Plaintiff and each Class Member for actual damages in an amount to be determined at trial or, alternatively, for "liquidated damages in an amount of $2,500." 18 U.S.C. § 2710(c)(2)(A). Under the Act, Filmsupply is also liable for reasonable attorneys' fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Filmsupply in the future.

82.     Plaintiff, on behalf of himself and the Class, seeks relief as further described below.

## SECOND CAUSE OF ACTION

### Violation of Cal. Civ. Code § 1799.3

83.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

84.     Cal. Civ. Code § 1799.3(a) prohibits video sellers from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is subject of the record, without the written consent of that individual".

85.     Filmsupply is a "person providing video recording sales or rental services" under Cal. Civ. Code § 1799.3(a) because it is in the business of selling prerecorded videos.

86.     Filmsupply knowingly and intentionally disclosed information that identified Plaintiff and Class Members video viewing and purchase history to Meta, including their Facebook ID's and the title of the videos that Plaintiff and Class Members viewed and downloaded.

87.     Plaintiff and Class Members did not consent, in writing or otherwise, to Filmsupply's disclosure of their video purchases to Meta. Filmsupply's disclosure of this information to Meta therefore violated Cal. Civ. Code § 1799.3(a).

88.     Plaintiff, on behalf of himself and the Class, seeks relief as further described below.

**THIRD CAUSE OF ACTION**

**Violation Of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.**

89.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

90.     The UCL prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice.  California Business & Professions Code § 17204 allows "any person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.  Such a person may bring such an action on behalf of themselves, and others similarly situated, who are affected by the unlawful, unfair, or fraudulent business practice or practices.

91.     Defendant's acts, omissions, practices, and non-disclosures as alleged herein constituted unlawful, unfair, and fraudulent business acts and practices within the meaning of Cal. Bus. & Prof. Code § 17200, et seq.

92.     Defendant's business acts and practices are unlawful because they violate Cal. Civ. Code. § 1799.3 and 18 U.S.C. § 2710 as set forth in this complaint.

93.     Defendant's acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. Defendant secretly disclosed, released, and otherwise misused Plaintiff's and other Class Members' video viewing information, with no corresponding benefit to its affected customers and other website visitors. And, because consumers were unaware of Defendant's incorporation of tracking tools into its website and/or that Defendant would disclose and release their video viewing information to unauthorized third parties, they could not have avoided the harm.

94.     Defendant should be required to cease its unfair and/or illegal disclosure of user data. Defendant reaped unjust profits and revenues in violation of the UCL.

95.     Plaintiff and other Class Members also suffered injury in fact as a result of Defendant's acts and practices because they would not have paid for Defendant's services had they known that Defendant was disclosing their personal identifiers and video viewing information to

unauthorized third parties in violation of its legal obligations, social norms, own statements on its website, and reasonable consumer expectations.

96.     Plaintiff seeks a declaration from the Court that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code §§ 17200 et seq. under the unlawful, unfair, and fraudulent prongs of the UCL

97.     Plaintiff also seeks restitution on behalf of himself and Class Members.

98.     Plaintiff and other Class Members lack an adequate remedy at law because the ongoing harms from Defendant's collection and disclosure of their information must be addressed by injunctive relief and, due to the ongoing and nature of the harm, the harm cannot be adequately addressed by monetary damages alone.

99.     This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public.  Private enforcement is necessary and places a disproportionate financial burden on Plaintiff in relation to Plaintiff's stake in the matter.  Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

100.    Plaintiff, on behalf of himself and the Class, seeks relief as further described below.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgement as follows:

101.    An order appointing Plaintiff as the Class Representative;

102.    An order appointing the undersigned attorneys as Class Counsel;

103.    An order declaring that Defendant's conduct violates the statutes referenced herein;

104.    An order awarding Plaintiff and Class Members actual damages but not less than liquidated damages in an amount of $2,500 per Class Member per violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq;

105. An order awarding Plaintiff and Class Members a civil penalty of $500 per violation pursuant to Cal. Civ. Code § 1799.3(c);

106. An order restoring to Plaintiff and other Class Members any money and property acquired by Defendant through its wrongful conduct;

107. An injunction forbidding Defendant from disclosing information about users' video viewing choices to third parties pursuant to 18 U.S.C. § 2710(c)(2)(D) and pursuant to Cal. Bus. & Prof. Code § 17200 et seq.;

108. An award of reasonable attorneys' fees and costs of suit, including costs of investigation pursuant to 28 U.S.C § 2710 set seq., Cal. Civ. Proc. § 1021.5 and any other applicable law;

109. An award of pre- and post-judgment interest as provided by law; and

110. An award of such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and all other members of the Class, hereby demands a jury trial on all issues so triable.

Dated: September 26, 2024                    Respectfully submitted,

_____
John J. Nelson (SBN 317598)
jnelson@milberg.com
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
402 W. Broadway, Suite 1760
San Diego, CA 92101
Telephone: (858) 209-6941
Fax: (865) 522-0049

JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pbrandler@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
HAMMONDLAW, P.C.

1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 807-1666

*Attorneys for Plaintiff and the Putative Class*